1  **WO**

2

3

4

5

6

7                  IN THE UNITED STATES DISTRICT COURT

8                       FOR THE DISTRICT OF ARIZONA

9

10  Sergio Santillan,                    )    No. CV-07-998-PHX-MHM
                                         )
11             Plaintiff,                )
                                         )    **ORDER**
12  v.                                   )
                                         )
13                                       )
    Michael J. Astrue,                   )
14  Commissioner of Social Security,     )
                                         )
15                                       )
               Defendant.                )
16  _____)

17  I.  Procedural Background

18         Sergio Coronado Santillan ("the Plaintiff") filed an application for Disability

19  Insurance benefits and Supplemental Security Income on December 3, 2001.  (Transcript

20  ("Tr.") 398).  The application listed a combination of physical and mental impairments,

21  including low back pain, left lower extremity pain, diabetes mellitus, depression and anxiety.

22  (Tr. 398).  The  Plaintiff listed a disability onset date of July 1, 2000.[1]  (Tr. 398).

23         A hearing was held on May 23, 2005 before Administrative Law Judge Michael

24  Cianci, Jr.  (See Hearing Transcript, Tr. 862-870).  The ALJ issued an unfavorable Notice

25  _____

26         [1]It appears that the Plaintiff actually filed three separate applications for disability
    benefits, two alleging an onset date of September 1, 1995, and one alleging an onset date of
27  July 1, 2000.  (Tr. 799, 401, 398).  However, counsel for the Plaintiff clarified at the ALJ
    hearing that the alleged onset date is actually July 1, 2000, and made repeated references at
28  the hearing to the correct onset date of July 1, 2000.  (See Tr. 867, 869).

1   of Decision on July 12, 2005.  (Tr. 35).  The Plaintiff requested a review of the decision,

2   which was denied.  (Tr. 15).  The Plaintiff brings the current action for judicial review of the

3   ALJ's decision pursuant to §205(g) of the Social Security Act, 42 U.S.C. § 405 (g).

4   II.  Standard of Review

5          The Commissioner's final decision that a claimant is not disabled will be upheld if the

6   findings of fact are supported by substantial evidence in the record as a whole and if the

7   Commissioner applied the proper legal standards.  Magallanes v. Bowen, 881 F.2d 747, 750

8   (9th Cir. 1989).  Substantial evidence is more than a mere scintilla, but less than a

9   preponderance.  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998).  It is such relevant

10  evidence as a reasonable mind might accept as adequate to support a conclusion.  Id.

11         In determining whether substantial evidence supports a decision, the Court considers

12  the entire record, weighing both the evidence that supports the Commissioner's conclusions

13  and the evidence that detracts from them.  Id.  "If the evidence can reasonably support either

14  affirming or reversing th[at] conclusion, the court may not substitute its judgment for that of

15  the [ALJ]."  Id.  If the evidence is inconclusive, "the questions of credibility and resolution

16  of conflicts in the testimony are functions solely of the [Commissioner]."  Sample v.

17  Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  But if on the whole record before this Court,

18  substantial evidence supports the Commissioner's decision, the Court must affirm it.  See

19  Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989); see also 42 U.S.C. § 405(g).

20         To establish eligibility for disability benefits, a claimant must show that (a) he suffers

21  from a medically determinable physical or mental impairment that can be expected to result

22  in death or that has lasted or can be expected to last for a continuous period of not less than

23  twelve months, and (b) considering age, education, and work experience, the impairment

24  renders the claimant incapable of performing work he previously performed, and incapable

25  of performing any other kind of substantial gainful work that exists in the national economy.

26  See 42 U.S.C. § 423(d)(1), (2)(A); Reddick, 157 F.3d at 721.

27

28

1    III.  Factual Background

2        A.  Work and Personal History

3        On the date of the hearing before the ALJ, the Plaintiff was thirty-nine years old.  The

4    record demonstrates that he has a 6th grade education (in Mexico), and is functionally

5    illiterate in English.  (Tr. 872, 58).  He lives in an apartment with his mother and brother.

6    (Tr. 878).  Between 1985 and 1995, the Plaintiff worked as a shrimp packager.  (Tr. 58).

7    1995 is the last year in which the Plaintiff has been able to work.  (Tr. 872).

8        B.  Medical History

9        A review of the Plaintiff's medical history reveals that the Plaintiff suffered from

10   multiple medical issues and illnesses, resulting in approximately fifty visits to doctors and

11   hospitals in a five year span.

12       On June 22, 2000, the Plaintiff is treated for (continued) posteromedial left knee

13   complaints.  (Tr. 586).  The physician notes that the Plaintiff "may be experiencing some

14   variant of popliteal entrapment syndrome."  (Id.)  The physician provides the Plaintiff with

15   samples of the prescription drug Celebrex, and recommends that he follow up with Dr.

16   Moussa in one month.  (Id.)  Dr. Moussa recommends an MRI.

17       The Plaintiff is treated post-MRI on both August 17, 2000 and September 21, 2000

18   for left leg gastroc pain.  (Tr. 584, 583).  He is referred to physical therapy, but is unable to

19   obtain treatment because it is not authorized by the industrial carrier.  (Tr. 583).  Dr. Moussa

20   provides the Plaintiff with samples of the prescription drug Vioxx.  (Id.)

21       On November 16, 2000, the Plaintiff obtains a recommended nerve conduction study

22   that results in abnormal findings.  (Tr. 593-96).  The study reveals irritation consistent with

23   possible "left L5" radiculopathy, as well as "[m]ildly prolonged H-reflex left vs. right,

24   consistent with possible irritation of a mild degree of the left S1 nerve root."  (Id.)

25       On November 21, 2000, in light of the Plaintiff's continued calf pain, Dr. Moussa

26   orders an MRI of the Plaintiff's lumbar spine and possible epidural injections in the event

27   that any pathology is noted.  (Tr. 581).  Coverage for the MRI is denied on the basis that the

28

industrial injury is limited to calf pain, and therefore there is no coverage for treatment of a back impairment.  (Tr. 580).

The Plaintiff is seen by Dr. Moussa on December 5, 2000 and May 15, 2001 for unimproved knee and calf pain.  (Tr. 579).  Dr. Moussa notes that an EMG shows evidence of radiculopathy, and that once the Plaintiff is able to obtain AHCCCS coverage, an MRI and epidural injections will likely be ordered.  (Id.)  On July 3, 2001, Dr. Moussa orders a refill of prescription Celebrex.  (Id.)

On January 24, 2002, the Plaintiff is treated for complaints of left medial compartment pain.  (Tr. 578).  Dr. Moussa notes that the Plaintiff is post medial meniscus repair.  (Id.)  The physical exam reveals mild medial joint space narrowing and "mildly positive McMurray's." (Id.)  An MRI is recommended (with follow-up once complete).  (Id.)

An MRI is performed the same day.  It finds abnormal signal intensity in the body of the medial meniscus, extending to the medial margin of the body of the medial meniscus. (Tr. 591-92).  The findings are most consistent with a large parameniscal cyst associated with horizontal tear of the body of the medial meniscus.  (Id.)  There is also abnormal signal intensity "extending into the substance of the posterior horn of the medial meniscus . . . compatible with intrameniscal degeneration in the posterior horn."  (Id.)  The report also notes "some thinning of the articular cartilage over the medial and lateral patellar facets, compatible with chondromalacia patellae."  (Id.)

On January 31 and February 28, 2002, the Plaintiff is treated for left knee medial meniscal cyst.  Dr. Moussa proposes arthroscopy surgery, and requests coverage through the industrial carrier.  (Tr. 577, 719).  The Plaintiff is advised that knee surgery will not address the low back pain complaints or radicular symptoms.  (Tr. 577).  Further, the physician notes that there may be continuing discomfort in the knee following the procedure, but that the Plaintiff still wishes to proceed.  (Id.)

As a self-pay patient, the Plaintiff obtains treatment on March 19, 2002 with Dr. Sell. He reports worsening back pain, occasional headaches, dizziness, blurred vision and high

1   blood pressure. (Tr. 616). The Plaintiff is diagnosed with hypertension and low back pain.

2   (Id.)

3       On April 11, 2002, the Plaintiff is treated for low back pain and hypertension. He

4   reports that pain limits his daily activities. (Tr. 447-50). He complains of constant pain in

5   his left foot and lower back that is aggravated by walking, sitting, or laying for extended

6   periods of time. (Tr. 451-52).

7       On May 3 and May 31, 2002, the Plaintiff is treated for high blood pressure and back

8   pain. (Tr. 611-14). His diagnoses include (improved) low back pain, poorly controlled

9   hypertension, left knee meniscal cyst and diabetes mellitus type II. (Id.)

10      On June 14, 2002, the Plaintiff is treated for diabetes, hypertension and radiating back

11  pain. (Tr. 608). He reports that the pain wakes him up three times per night, and is

12  accompanied by numbness and weakness in his left leg. (Id.) The physician notes that the

13  lower back pain seems to be worsening, and that sensations are mildly diminished on the

14  Plaintiff's left side.

15      On June 17, 2002, the Plaintiff undergoes a disability evaluation with Dr. Keith

16  Cunningham of the Social Security Administration. (Tr. 620-22). He reports chronic back

17  pain since 1993, with increased pain while bending or lifting. (Tr. 620). He also reports

18  progressive left knee pain, for which he is currently being evaluated for surgical excision of

19  the meniscal cyst. (Id.) The Plaintiff states that he takes Motrin for his symptoms. (Id.)

20      Radiology results on June 17, 2002 show mild osteoarthritis and disc herniation in the

21  Plaintiff's lumbosacral spine. (Tr. 626-28). On examination, the Plaintiff has normal gait

22  and coordination, and is able to get on and off the examination table independently. (Tr.

23  621). Dr. Cunningham states that the Plaintiff has a limited range of motion in his cervical

24  and lumbar spine. (Tr. 622). The range of motion in the Plaintiff's lower extremities is

25  described as normal throughout, with no evidence of spasm or atrophy. Dr. Cunningham

26  finds sensation and reflexes to be normal, and opines that the Plaintiff could perform light

27  work with postural limitations. (Tr. 623-24).

28

1    On June 19, 2002, the Plaintiff undergoes an MRI of the lumbar spine. (Tr. 627-28).

2 The MRI reveals a L5-S1 broad-based bulge with a superimposed broad-based left

3 paracentral disc herniation, causing virtual occlusion of the left foramen. (Tr. 627). The

4 report also notes some flattening of the ventral thecal sac without significant central stenosis.

5 The right foramen is mildly narrowed due to the degenerative bulge with mild facet

6 degenerative change. At L3-4 and L4-5, the MRI reveals a central and slightly leftward disc

7 herniation. At this level there is also a developmentally small canal and there is mild central

8 stenosis due to the central component of the disc herniation. (Id.)

9    On July 12, 2002, the Plaintiff is treated for continued low back pain with radiating

10 pains down the left leg, poorly controlled diabetes mellitus, and poorly controlled

11 hypertension. He is referred to neurosurgery for further evaluation of disc herniation. (Tr.

12 607).

13    During a follow-up visit on September 5, 2002, the Plaintiff is treated for diabetes,

14 worsened low back pain, intermittent epigastric pain and reflux. (Tr. 605). He is treated

15 again for low back pain and poorly controlled diabetes on September 19. (Tr. 604). The

16 physician suggests a follow-up with neurology. (Id.) The physician recommends that the

17 Plaintiff not return to work for three more months so that further evaluation of the lower back

18 pain may be completed. (Tr. 643).

19    On September 20, 2002, the Plaintiff is treated at Neurological Surgeons, P.C. (Tr.

20 644). The physician at Neurological Surgeons notes that the Plaintiff reports a history of

21 back problems that have become severe in the past year. (Id.) The physician states that the

22 radiating pain is "severe in nature and electrical in character." (Id.) On exam, the Plaintiff

23 has a positive straight leg raise on the left to 45 degrees with provokable pain radiating into

24 the inferior aspect of the foot. (Id.) The physician notes that the MRI of the Plaintiff's

25 lumbar spine shows bulging L4-5 and a herniated L5-S1 disc with a large central herniation

26 of L5-S1 eccentric to the left. (Id.) The physician also notes radiculopathy due to disc

27 herniation, and recommends microdisectomy. (Id.)

28

On October 11 and November 11, 2002, the Plaintiff is treated for poorly controlled diabetes, low back pain with disc herniation, and poorly controlled hypertension.  (Tr. 602, 603).

On January 23, 2003, the Plaintiff is treated at the Adult Mercy Care Clinic.  (Tr. 663-66).  He reports sudden onset of racing heart, sweatiness, extreme fear and feeling of impending doom and palpitations, followed by periods of extreme fatigue.  (Id.)  He reports that the symptoms have occurred one to two times per day for the past one to two years.  (Id.)  The Clinic finds evidence of diabetes, hypertension, anxiety/depression and disc herniation.  (Id.)  The clinic prescribes Celexa, and states that the Plaintiff may benefit from Neurontin.  (Id.)

On February 26, 2003, the Plaintiff is treated for anxiety, diabetes and low back pain.  (Tr. 661-62).  He presents as anxious, and reports that he missed his lab work on the last visit because of panic/anxiety.  (Tr. 661).  The report describes the Plaintiff's anxiety as severe/disabling.  (Id.)  The physician recommends that Zoloft be continued for an anxiety, and that Klonopin be started.  (Tr. 662).  The physician recommends continuing Neurontin for lumbar disc disease and radiculopathy.  (Id.)

On March 12, 2003, the Plaintiff fills out a questionnaire regarding his Activities of Daily Living.  (Tr. 468-71).  He states that all activities of daily living are difficult to perform due to pain.  (Tr. 468).  He lists seven prescription medications that he takes.  (Id.)

The Plaintiff obtains an x-ray of his right forearm and right elbow on March 26, 2003 after experiencing swelling for a month.  (Tr. 531-33).  The radiologist diagnoses mild degenerative cervical changes.  (Tr. 532).   The Plaintiff is also treated on the same day for diabetes, blurry vision, depression, panic, lumbar disc disease and swelling in his forearm.  (Tr. 658).

On April 29, 2003, the Plaintiff is treated for low back pain, radiculopathy, "stabbing" arm pain and panic attacks.  (Tr. 659).  The Plaintiff also complains of numbness and decreased grip strength in his right hand.  (Id.)  The physician notes that the Plaintiff is tolerating Zoloft well for his panic attacks.  (Id.)

1   　　　On May 2, 2003, the Plaintiff undergoes another evaluation with Keith Cunningham
2   of the Social Security Administration. (Tr. 667-69). He reports that the biggest reason that
3   he has difficulty working is low back pain. He also reports pain in his left ankle region. He
4   explains that he has difficulty walking, running, bending and lifting. (Id.) Dr. Cunningham
5   diagnoses chronic back pain with preserved range of motion, absent left ankle reflex
6   consistent with history of herniated L5-S1 disc, and left medial meniscal tear with good range
7   of motion. (Tr. 669). Dr. Cunningham opines that the Plaintiff can lift/carry 50 pounds
8   occasionally and 25 pounds frequently. He estimates that the Plaintiff can stand/walk about
9   6 hours in an 8 hour workday and sit 6 hours in an 8 hour work day. He opines that he can
10  occasionally climb and crawl, and frequently balance, stoop, kneel and crouch. (Tr. 670-71).

11  　　　On May 21, 2003, the Plaintiff is referred for evaluation of carpal tunnel syndrome.
12  (Tr. 681-82). He complains of a vague sense of weakness and pain radiating up to the
13  shoulder. (Tr. 682). The physician recommends bilateral EMG and nerve conduction
14  studies, as well as bilateral wrist and hand x-rays in order to rule out some type of diabetic
15  neuropathy. (Id.)

16  　　　On May 27, 2003, the Plaintiff is treated for diabetes, hypertension, back pain,
17  headaches and anxiety. (Tr. 655-56). He reports that he has seen a surgeon for carpal tunnel,
18  but that the surgeon is awaiting AHCCCS approval for treatment. (Tr. 655). Surgery to
19  repair the herniated discs is recommended, but the Plaintiff indicates that he does not wish
20  to proceed until the effectiveness of more conservative treatment is known. (Tr. 656). The
21  physician opines that the Plaintiff is unable to engage in work involving physical activity
22  secondary to herniated discs in his back. (Tr. 638).

23  　　　The Plaintiff is treated for low back pain and increasing lower left extremity radicular
24  pain, arm pain, poor sleep and hypertension on June 17, 2003. (Tr. 653-54).

25  　　　Less than a week later, on June 23, 2003, the Plaintiff seeks emergency room
26  treatment for general weakness, loss of appetite and epigastric pain. (Tr. 524-28). He has
27  flat affect and is staring at the ceiling. (Tr. 527). CT scans reveal a complex lesion in the
28  Plaintiff's kidney and advanced degenerative disc disease in the lumbar spine with broad-

based disc herniation at L4-5.  (Tr. 521-22).  Further, there is prominent central protrusion as well as prominent left paracentral osteophyte at L5-S1, leading to apparent compression of both S1 nerve roots.  (Tr. 521).  Due to a congenitally small canal, there is probably mild stenosis at L3-4 and 4-5.   Thus, even minimal degenerative changes may lead to more significant canal stenosis/narrowing.  (Id.)

On June 26, 2003, the Plaintiff seeks post-emergency room care for diabetes, dizziness, anxiety and pain.  (Tr. 651-52).  He is described as paranoid, very argumentative, and agitated.  (Tr. 652).

On July 3, 2003, the Plaintiff undergoes an ultrasound for further evaluation of the kidney lesion.  (Tr. 518-19).  The radiologist suggests that the lesion may not be a simple renal cyst, and recommends further workup with a dedicated renal cyst CT or MRI.  (Tr. 518).

The Plaintiff is seen for multiple medical problems on July 28, 2003.  (Tr. 649-50). He complains of low back pain, numbness in his left hand and foot, generalized pain in both forearms and hands, and associated weakness.  (Tr. 649).  The physician notes herniated discs and advanced degenerative disc disease complicated by a congenitally small canal. (Tr. 650).  The physician also notes that the Plaintiff is taking prescription narcotics for back pain.  (Id.)  The Plaintiff is referred for another MRI and neurosurgical consult.  (Id.)  A CT scan performed on July 31, 2003 reveals a left renal cyst and cholelithiasis.  (Tr. 516-17).

An MRI of the Plaintiffs lumbar spine is performed on August 11, 2003.  (Tr. 646). The radiologist notes normal alignment of the anterior and posterior elements, with no significant subluxations.  Vertebral heights are maintained, with relatively normal marrow signal.  However, the radiologist confirms that the MRI shows advanced degenerative disc disease with some endplate marrow changes, as well as disc dessication and disc space narrowing.  The MRI shows that central disc extrusion abuts both S1 nerve roots, and touches and deforms the ventral thecal sac. This contributes to neural foraminal stenosis and mild facet disease.  There is also a focal paracentral osteophyte along the superior aspect of

the L5-S1 level, which may also contribute to canal narrowing. Further ultrasound evaluation is recommended. (Id.)

The Plaintiff has a follow up appointment on October 23, 2003. (Tr. 745-46). He is treated for complaints of epigastric pain, disc herniation, diabetes and shortness of breath on exertion. The report indicates that the Plaintiff has seen Dr. Herro (Board Certified in pain management) who recommends a trial of steroid injections with surgery to follow if the injections are unsuccessful. (Tr. 746).

On November 24, 2003, the Plaintiff is evaluated by Dr. Robert Narvaiz at the request of the Social Security Administration. (Tr. 693-95). The Plaintiff indicates problems with back pain, leg pain, diabetes and hypertension. (Tr. 693). He also reports depression with symptoms of sadness, worthlessness, decreased appetite, poor sleep, decreased energy, fatigue, decreased memory, decreased libido, amotivation, anhedonia and poor concentration. (Tr. 694). He also reports panic attacks, during which he experiences trembling, sweating, cold sweats, feeling of impending doom, shortness of breath, difficulty in breathing, rapid heart rate and dry mouth. His depression and anxiety are lessened with medication. (Id.) The psychologist diagnoses panic attack disorder and major depression, and mentions the possibility that the Plaintiff has borderline IQ. (Id.) Under "prognosis," the psychologist opines that the Plaintiff may have difficulty dealing with stress, as well as with maintaining attention and concentration. He believes that the Plaintiff may not be able to carry out complex tasks, and recommends IQ testing. Finally, he notes that future pharmacological management should continue in order to maintain stability in terms of depression and anxiety. (Tr. 695).

On January 6, 2004, the Plaintiff is treated for headaches. (Tr. 741). He reports that he has not been able to take his medications for the past month because he stopped receiving assistance and cannot afford the co-payments. He reports continuing pain in all extremities. (Id.) He is diagnosed with medication non-compliance due to inability to pay. (Tr. 742). The physician notes that he will be re-referred to surgery "once he gets back on his meds." (Id.)

1   On January 11, 2004, the Plaintiff is treated in the emergency room for cough, chest
2   pain, nausea, decreased appetite and generalized weakness.   He is diagnosed with
3   pneumonia.  (Tr. 757-60).

4   On January 21 and February 5, 2004, the Plaintiff is treated for chronic pain.  (Tr.
5   735-38).  He complains that his medications are not successfully treating his pain.  He is
6   diagnosed with cholelithesis, lumbar/sacral disc herniation with radiculopathy, diabetes and
7   hypertension.  (Tr. 735-36).

8   On June 23, 2004, the Plaintiff's treating physician opines that the vertebral disc
9   extrusion, stenosis, and nerve impingement prevent the Plaintiff from performing any
10   substantially gainful employment.  (Tr. 717).

11   On July 6, 2004, the Plaintiff undergoes a nerve conduction study of the lower
12   extremity.  The findings are consistent with mild sensory neuropathy and longstanding
13   radiculopathy, likely left L5.  (Tr. 789).

14   Two days later, the Plaintiff is treated for pain in the hands, arms, low back and legs.
15   He describes the pain as burning, aching and deep.  The diagnosis is lumbar disc disease,
16   diabetic peripheral neuropathy, and left knee artifacts.  Under medications, the physician lists
17   Vicodin.  (Tr. 790).

18   On July 12, 2004, the Plaintiff is treated after having undergone a lumbar steroid
19   injection without relief.  (Tr. 725-26).  He complains of continuing low back pain that
20   radiates down both legs.  He rates the pain as 10/10 and never subsiding.  (Tr. 725).

21   On July 29, 2004, the Plaintiff is evaluated for peripheral neuropathy of the feet.  It
22   is noted that the Plaintiff's blood glucose is not well controlled.  (Tr. 796).

23   On August 16, 2004, September 27, 2004, November 30, 2004 and March 8, 2005,
24   the Plaintiff is treated for diabetes, dizziness, bilateral foot and hand pain and radiculopathy.
25   (Tr. 721-22; 835; 833-34; 831-32; 829-30).

26   The Plaintiff was found unresponsive by family members and admitted to the
27   emergency room with severe dehydration on March 16, 2005.  He is diagnosed with diabetes,
28   hypertension, GERD, depression, high cholesterol and lower back pain.  (Tr. 827).

On April 25, 2005, the Plaintiff is treated for constant, burning pain to the hands, legs and back. (Tr. 820-21). His diagnosis is stable diabetes, uncontrolled hypertension and peripheral neuropathy. (Id.)

A hearing is held on May 23, 2005 before Administrative Law Judge Michael Cianci, Jr. (See Hearing Transcript, Tr. 862-870). The ALJ issues an unfavorable Notice of Decision on July 12, 2005. (Tr. 35). The Plaintiff requests a review of the decision, which is denied on March 19, 2007. (Tr. 15). On March 19, 2008, the Plaintiff brings the current action for judicial review of the ALJ's decision pursuant to §205(g) of the Social Security Act, 42 U.S.C. § 405 (g).

IV.  Discussion

A.  Sequential Evaluation Procedure

In order to qualify for disability benefits, an individual must be unable to perform "any substantial gainful activity by reason of [a] medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a); 416.905(a).

The ALJ must use a five-step sequential evaluation process to determine whether a claimant is disabled within the meaning of the Social Security Act. The five steps are:

(1) Is the claimant presently engaged in "substantial gainful activity"?

(2) Does the claimant have a severe medically determinable physical or mental impairment (or combination of impairments) that meets the duration requirement?

(3) Does the impairment meet or equal one of a list of specific impairments described in the regulations?

(4) Does the claimant have residual functional capacity to perform his relevant past work?

(5) Does the claimant's residual functional capacity, age, education, and work experience allow her to make an adjustment to other work?

20 C.F.R. §§ 404.1520(a)(4)(I-v); 416.920(a)(4)(I-v).  The claimant has the burden of proof for steps one through four, and the Commissioner has the burden for step five.  <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999).

### B.  The ALJ's Analysis

#### 1.  Step One

At the first step of the analysis, the ALJ must determine whether the claimant is engaged in substantial gainful activity; if the ALJ finds that he is, he will not qualify as disabled. 20 C.F.R. §§ 404.1520(a)(4)(I); 416.920(a)(4)(I).  The ALJ correctly noted that the Plaintiff had not engaged in substantial gainful activity since September 1, 1995.  (Tr. 51).

#### 2.  Step Two

If the ALJ proceeds to the second step, he must determine whether the claimant suffers from a "severe medically determinable physical or mental impairment" (or combination of impairments) that meets the duration requirement imposed by the Social Security Act.  20 C.F.R. §§ 404.1520(a)(4)(ii); 416.920(a)(4)(ii).  The ALJ determined that the Plaintiff suffered from a severe impairment, resulting from the combination of his history of left ankle and knee disorder, back disorders, high blood pressure, diabetes, affective disorder and anxiety disorder.  (Tr. 51).

#### 3.  Step Three

At Step Three, the ALJ must determine whether the impairment meets or equals one of a list of specific impairments described in the regulations.   20 C.F.R. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii).  The ALJ found that the Plaintiff did not have an impairment or combination of impairments that met or equaled one of the listed impairments of 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 51).

#### 4.  Step Four

At the fourth step of the inquiry, the Plaintiff had the burden to show that he could no longer perform his past relevant work. <u>Sanchez v. Secretary of Health and Human Services</u>,

812 F.2d 509, 511 (9th Cir. 1987); 20 C.F.R. §§ 404.1520(a)(4)(iv); 416.920(a)(4)(iv).  The ALJ determined that the Plaintiff's medically determinable impairments did not prevent the claimant from performing his past relevant work.  (Tr. 52).

### 5. Step Five

Upon finding that the Plaintiff was capable of performing his past relevant work, the ALJ nonetheless proceeded to assess the Plaintiff's residual functional capacity, age, education, and work experience.  20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v).  The ALJ determined that the Plaintiff retained the residual functional capacity to perform a range of medium exertional work.  Specifically, the ALJ determined that the Plaintiff could lift and carry no more than 50 pounds occasionally and 25 pounds frequently; walk and/or stand for 6 hours of an 8-hour workday; and sit for 6 hours of an 8-hour workday.  (Tr. 51).  The Plaintiff was precluded from more than occasional bending, kneeling, crouching and crawling.  (Id.)  Further, he was limited to simple, repetitive tasks and low-stress work without high production quotas.  (Id.)

### C. Errors Alleged

The Plaintiff asserts that the ALJ made several errors in evaluating the Plaintiff's disability.  Specifically, the Plaintiff argues that the ALJ 1) misapplied the Ninth Circuit case Chavez v. Bowen; 2) failed to adjudicate the correct period of disability; and 3) erred in steps four and five of the five-step sequential evaluation analysis.

### 1. Misapplication of Chavez v.Bowen

In a prior disability claim filed in 1997, the Plaintiff sought a period of disability from September 1, 1995 through May 13, 1997.  (Tr. 58-69).  In a decision issued on April 30, 1999, ALJ M.B. Kennett concluded that the Plaintiff was not disabled.  (Id.)  He found, among other things, that the Plaintiff had residual functional capacity to perform no more than sedentary work, and that the Plaintiff was unable to perform his past relevant heavy work as a shrimp packer.  (Tr. 67).

In the current disability decision, ALJ Cianci assessed a medium residual functional capacity, and determined that the Plaintiff's past relevant work actually qualified as medium,

1    rather than heavy work. (Tr. 51). Accordingly, ALJ Cianci concluded that the Plaintiff is

2    capable of performing his past relevant work.

3        The Plaintiff, citing to Chavez v. Bowen, 844 F.2d 691 (9th Cir. 1988), argues that

4    the ALJ was prohibited from assessing a medium functional capacity and determining that

5    the past work qualified as "heavy." (Dkt. #15).

6        In Chavez, the Ninth Circuit determined that the findings by a previous ALJ

7    concerning "residual functional capacity, education and work experience are entitled to some

8    res judicata consideration in subsequent proceedings." 844 F.2d at 694. The Court indicated

9    that "[p]rinciples of res judicata made binding the first judge's determinations that the

10   claimant had a residual functional capacity of light work, was of limited education, and was

11   skilled or semi-skilled." Id. The Plaintiff argues here that, at a minimum, ALJ Cianci would

12   have to set forth a detailed explanation as to how the Plaintiff's impairments and the medical

13   records support a finding of an *improvement* in functional capacity. (Dkt. #15).

14       A presumption of continuing nondisability arises from an earlier finding of non-

15   disability. Chavez, 844 F.2d at 693; Acquiescence Ruling 97-4(9). In order to rebut the prior

16   finding of nondisability, the Plaintiff must prove "changed circumstances" indicating a

17   *greater* disability. Chavez, 844 F.2d at 693 (citing Taylor v. Heckler, 765 F.2d 872, 875 (9th

18   Cir. 1985)). Here, the Plaintiff rebutted the presumption of continuing nondisability by

19   establishing that he suffered from new severe impairments, including an affective disorder,

20   anxiety disorder and back disorder. (Tr. 42).

21       Despite the fact that the Plaintiff rebutted the presumption of continuing nondisability

22   from the previous disability determination, the ALJ noted that he continued to be bound by

23   the findings made in the earlier decision concerning residual functional capacity, education

24   and work experience, *unless new and material evidence was submitted.* (Tr. 43). The ALJ

25   went on to find that the "new and material medical records submitted show the presence of

26   mental limitations that would change [the Plaintiff's] residual functional capacity." (Tr. 43).

27   The ALJ then began the sequential evaluation procedure anew, determining from the entire

28

1   record (beginning September 1, 1995) that the Plaintiff retained a medium residual functional
2   capacity.  The Court finds this readjudication to be legal error.

3        In effect, ALJ Cianci afforded no res judicata effect to the previous decision's
4   determination of residual functional capacity, contrary to the requirements of <u>Chavez v.</u>
5   <u>Bowen</u>, 844 F.2d 691, 694 (9th Cir. 1988).  He used the very evidence that rebutted the
6   presumption of continuing nondisability — the presence of new and severe impairments —
7   to reopen the previous ALJ's residual functional capacity determination.  Further, the later-
8   developed impairments are inconsistent with the concept that the Plaintiff experienced
9   medical *improvement* resulting in a higher residual functional capacity.  Accordingly, the
10  Court finds that the readjudication of residual functional capacity is unsupported by the
11  record and constituted legal error.

12       As the Defendant notes, however, this error does not automatically make this case
13  subject to remand.  (Dkt. #20).  Even if the Plaintiff were limited to sedentary work (as per
14  the previous ALJ's determination), the vocational expert identified a significant number of
15  sedentary jobs that the Plaintiff could perform.  Accordingly, the Court must proceed to
16  address the other alleged errors.

17                  2.  Failure to Adjudicate the Correct Period of Disability

18       The Plaintiff asserts that ALJ Cianci failed to adjudicate the correct period of
19  disability by improperly considering the period of 1995 through April, 1999.  Despite the
20  Plaintiff's repeated attempts to limit the ALJ's consideration to the appropriate alleged onset
21  date of disability (which was July 1, 2000), the Plaintiff argues that the ALJ inappropriately
22  based his determination in part on medical records from 1993, 1996 and 1999.

23       The Defendant responds that the ALJ did not reopen the previously-adjudicated time
24  period, and merely considered the longitudinal track of the Plaintiff's impairments and
25  symptoms.  (Dkt. #20).

26       The Court finds that the ALJ did adjudicate an incorrect period of disability.  His
27  decision states that "[t]he objective medical evidence in the record since his alleged onset
28  date of disability of December 1, 1995 through December 31, 2000 is fully consistent with

the above residual functional capacity and inconsistent with disabling levels of pain and limitations." (Tr. 44). This statement indicates at the very least some confusion with respect to the correct period of disability.

### 3. Errors in Steps Four and Five of the Sequential Evaluation Procedure

The Plaintiff points to several supposed errors in the ALJ's disability determination. The Court finds, however, that one issue in particular is dispositive here: the ALJ's consideration of the Plaintiff's pain testimony.

### a. Pain Testimony

The ALJ assessed the Plaintiff's complaints of disabling pain and his subjective limitations. (Tr. 49-50). He concluded that the medical evidence as a whole did not support the Plaintiff's complaints, and that the Plaintiff was not credible. (Tr. 49). The Plaintiff argues that the ALJ failed to provide clear and convincing reasons, based on facts in the record, to reject the Plaintiff's pain testimony.

The Defendant responds that the ALJ provided clear and convincing reasons for discounting the Plaintiff's credibility, including that the medical evidence did not support the Plaintiff's claims. The Defendant argues further that the ALJ properly relied on the opinions of the state agency physicians that reviewed the Plaintiff's medical files. The Defendant asserts that the ALJ may rely on the opinions of state agency reviewers, as a matter of law, "if those opinions are well-supported and consistent with the record as a whole." (Dkt. #20) (citing 20 C.F.R. § 404.1527(f); Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996)). The Defendant also points out that where the ALJ's interpretation of the evidence may not be the only reasonable one, but is supported by substantial evidence, it is not the Court's role to second guess it. (Dkt. #20) (citing Burch v. Barnhart, 400 F.3d 676, 680-81 (9th Cir. 2005).

The ALJ must provide legally sufficient reasons for rejecting the Plaintiff's pain testimony. Where a claimant "produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain." Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005) (explaining that the rationale behind this rule is that

1    testimony regarding pain may establish a greater limitation than medical evidence alone.)
2    Id. Further, without affirmative evidence of malingering or exaggeration, the ALJ's rejection
3    of pain testimony must be clear and convincing.  Id.

4         The Court finds that the Plaintiff has produced plenty of medical evidence of
5    underlying impairments that are expected to cause pain.  The Plaintiff's impairments include
6    worsening degenerative disc disease, herniated discs, broad-based disc bulge with
7    superimposed broad-based left paracentral disc herniation, radiculopathy, leg and foot pain,
8    likely parameniscal cyst associated with horizontal tear, diabetes mellitus, major depression
9    and panic attack disorder.  (Tr. 586, 582, 593, 579, 591, 627, 644, 602, 659, 681, 627, 577
10   and 693-96).

11        The ALJ does not allege or cite to any evidence of exaggeration or malingering on the
12   part of the Plaintiff.  Accordingly, the ALJ's reasons for rejecting the Plaintiff's pain
13   testimony must be clear and convincing.  Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir.
14   2005).

15        In this case, the ALJ listed several reasons for discounting the Plaintiff's credibility.
16   He noted preliminarily that the Plaintiff's allegations were not supported by the medical
17   evidence as a whole.  He also found it important that the Plaintiff does not require any
18   ambulatory devices, that he was able to travel to Mexico three times by bus since 1995, and
19   that no physician has endorsed the claimant's limitations and allegations of disabling pain.
20   The ALJ also noted that the Plaintiff was able to take the city bus, walk three blocks to the
21   bus stop, play with his cat, grocery shop, visit with his family, watch television and read.
22   The ALJ also found it significant that the Plaintiff indicated that he takes only Tylenol for
23   pain. (Tr. 49).

24        The Court finds that the ALJ did not provide legally sufficient reasons for rejecting
25   the Plaintiff's pain testimony.  The Court notes that, in part, the ALJ's credibility
26   determinations are based on some factual inaccuracies.  His decision notes that "no treating
27   physician has endorsed the claimant's limitations and allegations of disabling pain."  In fact,
28   three treating physicians have reported that the Plaintiff suffers from a disability and is


unable to work due to herniated discs, back pain and proven vertebral disc extrusion with stenosis and nerve impingement.  (Tr. 638, 643 and 717).

The ALJ's partial reliance on the fact that the Plaintiff only takes Tylenol is similarly misplaced.  The record reflects that the Plaintiff was prescribed and underwent epidural injections of steroids in order to help treat his pain.  (Tr. 579, 746 and 725-26).  Further, the Court has found numerous instances in the record where the Plaintiff was prescribed narcotic and other prescription pain relievers.  (See, e.g., Tr. 474, 524, 650, 725, 732, 733, 790, 821 and 826).  The record repeatedly reflects the Plaintiff's reports that he is a "self-pay" patient, (See, e.g.,  Tr. 579), and that he is seeking (and has had difficulty obtaining) assistance through AHCCCS.  (Tr. 616, 655).  Further, on one occasion the Plaintiff was explicitly diagnosed with "medication non-compliance [secondary to] inability to afford them."  (Tr. 742).  That the Plaintiff's physicians saw fit to treat the Plaintiff with more than conservative anti-inflammatory medications is the important factor here, and one that was apparently ignored in the ALJ's  determination.

The fact that the Plaintiff does not require ambulatory devices, while an appropriate factor to consider, is not dispositive of the issue of whether the Plaintiff's pain is disabling.  In addition, the fact that the Plaintiff was able to carry on some functions of daily living — taking the city bus, walking three blocks to the bus stop (with pain), playing with his cat, occasional grocery shopping (with both pain and assistance from relatives), visiting with his family, watching television and reading — is not inconsistent with disabling pain.  These activities do not conflict with the Plaintiff's other testimony, and the ALJ did not make specific findings that these activities are transferable to the workplace.  See Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (finding that two grounds must be present for daily activities to result in an adverse credibility determination: 1) that the activities contradict the claimant's other testimony,[2] or 2) there are specific findings that the daily activities are

_____

[2]The ALJ suggests that the Plaintiff's credibility is undermined by the fact that he was able to travel to Mexico three times by bus since 1995.  He asserts that this "certainly indicates [the Plaintiff] is able to sit for longer than his self imposed sitting limitations . . ."

1  "transferable" to a work setting).  The Social Security Act does not require claimants to be

2  "utterly incapacitated" to have benefits eligibility.  <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th

3  Cir. 1989).

4          Accordingly, the Court holds that the ALJ's rejection of the Plaintiff's pain testimony

5  was not supported by clear and convincing reasoning, as required by <u>Burch v. Barnhart</u>, 400

6  F.3d 676, 680 (9th Cir. 2005).  Having determined that the ALJ improperly rejected the

7  Plaintiff's pain testimony, the Court must determine the appropriate remedy.

8          D.  Remand for Calculation of Benefits

9           Where the "ALJ's reasons for rejecting the claimant's testimony are legally

10  insufficient and it is clear from the record that the ALJ would be required to determine the

11  claimant disabled if he had credited the claimant's testimony," the Court remands for a

12  calculation of benefits.  <u>Orn</u>, 495 F.3d at 640 (internal quotation and citations omitted).  Such

13  is the case here.  The vocational expert, whose opinion the ALJ accepted and adopted,

14  testified that the Plaintiff would be totally disabled if his testimony were credited.  (Tr. 50,

15  884).  Accepting the Plaintiff's testimony as true, the Plaintiff is precluded from performing

16  his past work and all other jobs.  (Tr. 884).  Accordingly, remand for benefits is appropriate.

17  <u>Reddick v. Chater</u>, 157 F.3d 715, 728-29 (9th Cir. 1998).

18  <u>V.  Conclusion</u>

19          The Court finds that the ALJ misapplied <u>Chavez v. Bowen</u>, 844 F.2d 691 (9th Cir.

20  1998), and that he failed to adjudicate the correct period of disability.  Further, the ALJ's

21  reasons for rejecting the Plaintiff's pain and limitation testimony are legally insufficient

22  under the standard of <u>Burch v. Barnhart</u>, 400 F.3d 676, 680 (9th Cir. 2005).  When this

23  testimony is credited, the Court must conclude that the Plaintiff is disabled, and thus,

24  remands for benefits.

25  _____

26  (Tr. 49).  However, the Plaintiff was not asked and did not testify as to when these bus trips

27  occurred — an additional problem resulting from the ALJ's adjudication of an incorrect
   period of disability.  Furthermore, the Court does not find that three trips to Mexico over a

28  ten-year period is sufficient evidence of nondisability.

Accordingly,

**IT IS ORDERED** granting the Plaintiff's Motion for Summary Judgment, (Dkt. #15), and denying the Defendant's Cross-Motion for Summary Judgment.  (Dkt. #20).

**IT IS FURTHER ORDERED** reversing the decision of the ALJ, (Tr. 41-52), and remanding to the Commissioner of Social Security for payment of benefits.

DATED this 5th day of September, 2008.

_____
Mary H. Murguia
United States District Judge